# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# OCALA DIVISION

**FRIENDS OF ETNA TURPENTINE CAMP, INC.**, a Florida non-for-profit corporation

    Plaintiff,

v.                                          Case No: 5:18-cv-291-Oc-30PRL

**U.S. DEPARTMENT OF THE INTERIOR, RYAN ZINKE, U.S. FISH AND WILDLIFE SERVICE, GREG SHEEHAN and JIM KURTH**

    Defendants.

## ORDER

Citrus County, located on the west coast of Florida, is dotted with preserves, wildlife management areas, and state forests. Hidden within the Withlacoochee State Forest is the Etna Turpentine Camp, which was lost to time until its discovery in the early 1990s and listed on the National Register of Historic Places in December 2009. Etna was a turpentine still complex and town in the early 1900s. Recent data recovery excavations discovered the intact foundation of a turpentine still, as well as items scattered throughout what was the camp and home sites of its workers. The items include bricks, ceramic, glass, coins, toys, pencils, and hearty cups (or fragments of them), which were used to collect the resin from pine trees to produce the turpentine.

Etna is located near and adjacent to a power line and gas pipeline easement (the construction of which actually lead to its discovery), but is about to be lost to a highway, as it sits in its direct path.

The Suncoast Parkway is a toll road that runs north from Tampa, coming up through Pasco County and currently ending at U.S. Highway 98 in Hernando County, just south of Citrus. The

Florida Department of Transportation, through the Florida Turnpike Enterprise (FTE), is building the Suncoast Parkway II, which will start where the Suncoast Parkway currently ends and travel 13.5 miles north, coming up through the Withlacoochee State Forest and the Etna Turpentine Camp, while traveling adjacent to the existing power line and gas pipeline easement on the edge, but within, the state forest. The terminus is at State Road 44, an existing east to west corridor that can take a traveler west to Crystal River (both the city and the river that connects to the Gulf of Mexico) or East to Inverness and then an Interstate 75 interchange, located just north of the start of Florida's Turnpike.

Plaintiff here, the Friends of Etna Turpentine Camp, Inc., seeks to save the physical location of the camp from the highway. To do so, it doesn't challenge the Section 106 process of the National Historic Preservation Act that resulted in a Memorandum of Agreement to mitigate, though not prevent, the impact on the site. Nor do they challenge directly the selection of the initial alignment through Etna over an avoidance/mitigation alignment to the east of the camp, which the State was concerned would create an island of 80 acres east of the power line easement and west of the highway that would impair the ability to manage prescribed burns and result in greater impacts to the species.

Instead, it contends that the incidental take permit, which was issued by the U.S. Fish and Wildlife Service to the State, and is necessary for the State to proceed, should be set aside because the FWS failed to take a "hard look" at the environmental impacts of the State's permit application insofar as the FWS principally failed to consider the "Coastal Connector." Plaintiff repeatedly argues in its motion for a preliminary injunction (e.g., Doc. 3, p. 9-10) and the complaint (e.g., Doc. 1, para. 108-115) that because the FWS "limited their impacts evaluation to only the 1,300 acres between US Highway 98 and SR 44", and failed to evaluate the impacts of the coastal

connector, it violated the National Environmental Policy Act (NEPA) and the Administrative Procedures Act (APA): it shouldn't have issued the Finding of No Significant Impact (FONSI), but instead should have prepared an Environmental Impact Statement.

To preserve itself, Etna attempts to speak for the snakes. It challenges the FWS's issuance of the incidental take permit authorizing the take of the threatened eastern indigo snake, as well as the federal candidate gopher tortoise, within the action area: a 900 acre area, 700 of which are suitable for the snake and tortoise and will be directly impacted from U.S. Highway 98 north to SR 44. The snake, and the tortoise, however, have had a voice for a while, as has Etna, for that matter. The process, according to the Defendants, dates back to the early 1990s, before Etna was listed.

The FWS prepared an Environmental Assessment in May 2016, addressing, among other things, the need for the project, the impacts, mitigation, and the alternatives, including a no action alternative. It incorporates the State's Habitat Conservation Plan, which also addresses impacts on the species, mitigation measures, and consideration of alternatives. The FWS issued a biological opinion in July 2017 laying out the history of its review, including the State's Habitat Conservation Plan, an assessment of impacts on the species in the action area and mitigation, as well as noting the Section 106 review and MOA related to Etna. The FWS then issued its FONSI in July 2017, reviewing its analysis and findings as to the species and Etna, and ultimately issued the permit shortly thereafter. Plaintiff filed this suit a year later and says the permit, which was issued for the take of the snakes, shouldn't have issued without consideration of the coastal connector.

Plaintiff asks the Court to declare that the FWS violated NEPA and the APA; set aside the permit; and enjoin the FWS from authorizing any further agency action under the permit until it complies with the statutory and regulatory demands of NEPA and the APA. Specifically, on June

13, 2018, Friends of Etna filed an emergency motion for a temporary restraining order and a preliminary injunction (Doc. 3) asking the Court to direct the FWS to suspend effectiveness of the permit for the Suncoast Parkway II, and enjoin Defendants from authorizing any further ground-clearing activities pending adjudication of the merits of this case. On June 14, 2018, the District Judge granted Plaintiff's motion for a temporary restraining order and referred the motion for preliminary injunction to me. (Doc. 5). The Florida Department of Transportation ("FDOT") subsequently intervened. The parties then consented to me conducting all proceedings and entering a final order as to the motion for preliminary injunction. (Doc. 44, 45).

Responses, pertinent parts of the administrative record, and other evidentiary materials have been filed by all parties. (Docs. 35, 36, 37, 38, 39, 40, 43). Today the Court heard oral argument and received the testimony of witnesses on the motion, the transcript of which is incorporated by reference.

Based on the evidence and argument advanced at the hearing, as well as the papers, the temporary restraining order (Doc. 5), which was set to expire today, is **DISSOLVED** and Plaintiff's motion for preliminary injunction (Doc. 3) is **DENIED** because Plaintiff has failed to meet its burden to show that it is likely to succeed on the merits of its claims.

## I. STATUTORY BACKGROUND

### A. Endangered Species Act

The incidental take permit in dispute here was issued pursuant to the Endangered Species Act. The ESA provides for listing species as "threatened" or "endangered" if warranted, as well as for designation of their "critical habitat." 16 U.S.C. § 1533(a). Once listed, certain protections apply, including the prohibition of taking any endangered specifies of fish or wildlife. The ESA establishes a permit process through which a private or non-federal party may receive a permit

authorizing the incidental take of such species under certain circumstances. 16 U.S.C. § 1539(a)(2)(B)(i)-(v). To secure a permit, the applicant must submit a conservation plan specifying: (1) the likely impact of the taking; (2) steps being taken to minimize those impacts and the funding available to implement those steps; (3) alternative actions considered and the reasons they were rejected; and (4) other measures the Secretary deems necessary or appropriate. 16 U.S.C. §§ 1539(a)(2)(A); 50 C.F.R. § 17.32(b)(1).

### B. National Environmental Protection Act

NEPA is a procedural statute that requires federal agencies to inform themselves of the environmental effects of proposed federal actions, and consider reasonable alternatives, before taking action. *City of Oxford v. FAA*, 428 F.3d 1346, 1353 (11th Cir. 2005). NEPA does not mandate any specific outcome: "agencies may make a decision that preferences other factors over environmental concerns as long as they have first adequately identified and analyzed the environmental impacts." *Citizens for Smart Growth v. Sec. of the Dept. of Transp.*, 669 F.3d 1203, 1211 (11th Cir. 2012) (citing *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361 (11th Cir. 2008). A court reviewing NEPA compliance may only ask whether the agency took a "hard look" at environmental consequences. *Id.* Notably, "[t]he agency need not have reached the same conclusion that the reviewing court would reach; the agency must merely have reached a conclusion that rests on a rational basis." *City of Oxford*, 428 F.3d at 1352. In other words, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Van Antwerp,* 526 F.3d at 1361–62 (quoting *Robertson*, 490 U.S. at 350–51, 109 S.Ct. 1835 (footnote omitted)).

The Council on Environmental Quality ("CEQ"), an agency created by NEPA in the Executive Office of the President, has issued regulations to guide agencies' compliance. 40 C.F.R. §§ 1500.1-1508.28. To comply with NEPA, agencies first prepare an Environmental Assessment

(EA). 40 C.F.R. §§ 1501.3–1501.4. The EA is a "concise" public document that "[b]riefly" discusses the environmental impacts of, and alternatives to, a proposal for federal action. 40 C.F.R. § 1508.9. The agency must consider the direct, indirect and cumulative impacts of proposed activities as well as the significance of those impacts on the human environment. 40 C.F.R. §§1508.7, 1508.8, 1508.27(b). If the proposed action will have "significant" environmental impacts, NEPA directs agencies to prepare an Environmental Impact Statement ("EIS") which is a more detailed environmental review that analyzes the environmental impacts of the proposal, reasonable alternatives, and other factors. 40 C.F.R. §§1501.4, 1502.3, If, however, the agency prepares an EA and concludes, as occurred here, that the proposed action is not likely to have significant impacts, the agency may issue a Finding of No Significant Impact (FONSI), and the NEPA process is complete. 40 C.F.R. § 1508.13. A FONSI is a factual determination which implicates substantial agency expertise and is entitled to deference. *See Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 376-77 (1989).

## II. STANDARD OF REVIEW

To secure a preliminary injunction, a party must establish that: (1) it has a substantial likelihood of success on the merits, (2) irreparable injury will be suffered unless the injunction is issued, (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). A preliminary injunction is an "extraordinary and drastic remedy" not to be granted unless the movant clearly establishes the burden of persuasion as to each of the four prerequisites. *Id.*

In reviewing the preliminary injunction claim, the court considers the likelihood of success on the merits. That analysis requires the court to consider the merits of a plaintiff's claim under

the appropriate legal standard for review of that decision. The focus here is on NEPA's requirement that the agency prepare an EIS for any "major" federal action which will "significantly" affect the "human environment." The FWS issued the ITP without preparation of an EIS because it found no significant impact. Plaintiff contends that this FONSI was arbitrary and capricious, in violation of NEPA and the APA.

The Court's review of an agency decision to issue a FONSI is subject to the APA's "arbitrary and capricious" standard. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 375-76 (1989). The "'[a]dministrative action ... comes before the courts clothed with a presumption of regularity,'" and Plaintiff bears the "difficult" and "heavy" burden to demonstrate that the agency decisions were arbitrary, capricious, or otherwise not in accordance with the law. *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1222-23 (11th Cir. 2002). The reviewing court may overturn the agency's decision only if:

> The decision does not rely on factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise.

*City of Oxford,* 428 F.3d at 1352 (internal citation omitted). Thus, the Court reviews the FONSI and issuance of the Permit only to determine whether the FWS adequately assessed the project's environmental impacts in accordance with statutory requirements and reached rational conclusions based on the evidence gathered.

III.  DISCUSSION

   A. Background

The Suncoast Parkway II ("Suncoast II") will extend the existing Suncoast Parkway northward from its terminus at US 98 in Hernando County, to SR 44 in Citrus County, a distance of approximately 13.5 miles. (Doc. 1-1 at 2; Doc. 36-2 at 63). It will be a limited-access toll road

that will consist of a four-lane divided highway with two lanes for northbound travel and two lanes for southbound travel, and associated drainage, lighting, highway signage, traffic signalization, guardrails and sidewalks. Included in the project is construction of one wildlife crossing, four oversized wildlife culverts, and 15 new bridge spans either over local roads or over Suncoast II. The Suncoast Trail, which is part of Florida's Statewide Greenways and Trails System, will be extended to State Road 44 and a pedestrian overpass will be constructed over U.S. Highway 98.

Planning for the Suncoast II began in 1994 and has involved multiple state and federal agencies. (*See* Doc. 40-2 at 1-4). Initial plans proposed an extension of the Suncoast Parkway from its current northern terminus on U.S. Highway 98 to U.S. Highway 19, north of Crystal River. On February 6, 1998, a State Environmental Impact Report (SEIR) analyzing the impacts from that proposed extension was approved. (Doc. 36-1, Martin Horwitz Affidavit, Exhibit VI).

In 2010, FDOT re-evaluated the extension of the Suncoast Parkway. It was determined that "no substantial changes have occurred in the social, economic, or environmental effects of the proposed action that would significantly affect the quality of the human environment." *Id.* at Exhibit VII.

In December 2014, the State's Acquisition and Restoration Council ("ARC") approved the conveyance of a 278-acre public transportation easement to FDOT. (Doc. 1, Exhibit O). In 2017, FDOT conducted a design change and construction advertisement re-evaluation to advance the project to construction from U.S. Highway 98 to State Road 44. (Martin Horwitz Affidavit, Exhibit VIII). The 2017 re-evaluation also reduced the roadway width from 400 feet to 350 feet and advanced the funded portion of the roadway for construction.

Because the federally threatened eastern indigo snake (*Drymarchon coais couperi*) and the gopher tortoise (*Gopherus polyphemus*), which is a candidate for federal listing, were documented

in the area, in July 2015 the State submitted an application for an incidental take permit, as well as the required Habitat Conservation Plan (HCP), and draft environmental assessment. (*See* Doc. 36-1, Affidavit of Martin K. Horwitz, Exhibits I, II, III). The State estimates that approximately 700 acres of suitable habitat within the planning area, including 288 acres within the state-owned Withlacoochee State Forest, would be developed. The State estimates that up to 9 eastern indigo snakes may be harmed or harassed. Survey results show that approximately 258 gopher tortoises within the project right-of-way will be relocated prior to construction and will not be subject to injury, mortality or harassment. The HCP detailed mitigation efforts that would be taken and discussed alternative actions. The State explained that it chose "Alternative 3" for the Suncoast II because it minimizes impacts to wildlife habitat by reducing the overall project footprint and reducing impacts to state conservation lands.

FWS reviewed the draft HCP and the available scientific information available about the eastern indigo snake and the gopher tortoise and published a draft EA. (Doc. 40-1).

On April 17, 2017, the FWS published notice in the Federal Register that it had received and was making available for comment FDOT's application for the permit and the EA that analyzes the take of the covered species and the environment. On July 6, 2017, the FWS issued its final biological opinion regarding the permit. (Doc. 1-1, Exhibit X).

On July 13, 2017, the Department of the Interior recommended issuance of the incidental take permit, making a finding of no significant impact (FONSI). (Doc. 1-1, Exhibit Z). On July 25, 2017, the FWS concurred with the Department of the Interior. (Doc. 1-1, Exhibit Z). On July 28, 2017, the FWS issued the permit to the State. (Doc. 40-6). The permit provides several mitigation measures including: (1) all gopher tortoises found on state lands will be relocated to an approved and permitted area within the Withlacoochee State Forest; (2) gopher tortoises found on

private lands will be relocated to Florida Fish and Wildlife Conservation Commission recipient sites; (3) eastern indigo snake eggs will be transferred to Orianne Center for Indigo Conservation; and (4) eastern indigo snakes observed will be relocated to adjacent suitable habitat or conservation lands. In addition to the species relocations, FDOT has purchased 288 acres of high-quality forest land and transferred this to the State for inclusion in the Withlacoochee State Forest to offset 288 acres of impact to State Lands and paid $360,000 to the Friends of Florida State Forests to help manage the transferred acreage. (Doc. 36-1, Martin Horwitz Affidavit at ¶22). The Permit also requires FDOT to offset impacts to private lands, and that will be accomplished by purchasing at least 519 acres of upland property. (*Id.* at 23).

The Etna Turpentine Camp historic site, a National Historic Register Property will also be impacted by the Suncoast II. As part of the permitting process, and to fulfill the requirements of the National Historic Preservation Act of 1966 (NHPA), two cultural resource meetings were held to discuss potential impacts to Etna and mitigation of those impacts. (Id. at ¶¶ 14, 15, 16). These meetings were advertised and the public was invited to attend. On February 19, 2016, the Acquisition and Restoration Council held a public meeting regarding the public transportation easement approved in December 2014 and the potential impacts to the Etna Turpentine Camp site. During this meeting ARC discussed a proposed alternative route which would have relocated the easement outside the boundaries of the Etna Turpentine Camp site (known as the "Avoidance/Minimization Alignment"). After concerns were raised about the alternative route causing greater impacts to the species and resources, no member of ARC moved for acceptance of the Avoidance/Minimization Alignment.

In August 2017, the FWS and the State Historic Preservation Office, with the FDOT, FTE, and Florida Forest Service concurring, executed a Historic Preservation Memorandum of

Agreement ("MOA") for mitigation of unavoidable impacts to the Etna Turpentine Camp. (Doc. 40-7). It provides that the agencies will take measures to protect historic resources that are outside of the right of way and will institute a "Data Recovery Plan" for the recovery of archaeological data from areas impacted by ground-disturbing activities. The State also agreed to design and construct a "museum quality interpretive exhibit/collection of replica record archive" to showcase the information, data, and artifacts recovered from the right of way. It is also possible that the foundation of the still will remain at the site with a multi-use trail and an interpretive kiosk or historical marker.

Construction of the Suncoast II began in February 2018. Several months later, on June 12, 2018, Friends of Etna filed this action.

### B. Analysis

While Friends of Etna is a Florida non-profit corporation focused on the preservation of the Etna Turpentine Camp, it is now attempting to stop construction of the Suncoast II (and thus protect the Etna Turpentine Camp) by challenging the FWS's FONSI decision and issuance of the permit authorizing the take of the eastern indigo snake and the gopher tortoise. Friends of Etna argues that the FWS failed to take a "hard look" at the direct, indirect, and cumulative impacts of the project. At the hearing, Plaintiff clarified that it is only raising two specific challenges: (1) that FWS failed to consider the impacts of another reasonably foreseeable road project, referred to as the Coastal Connector; and (2) that the FWS did not consider the fact that FDOT allegedly obtained a permit from the South West Florida Water Management District for up to 8 lanes for the Suncoast II.[1]

---

[1] In its papers, Plaintiff raised several arguments that it abandoned at the hearing insofar as it didn't address them – that the Habitat Conservation Plan relied upon by Defendants to issue the permit was based on an outdated report and that Defendants failed to factor into their analysis the "significant public outcry and controversy" surrounding Suncoast II. Even if not abandoned, there is no evidence to support either

### 1. Coastal Connector

NEPA requires a federal agency to analyze the cumulative impacts of a proposed project in conjunction with any other, related actions. *City of Oxford, Ga. v. F.A.A.,* 428 F.3d 1346, 1353 (citing 40 C.F.R. § 1508.27). The NEPA regulations define "cumulative impact" as "the impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions . . ." 40 C.F.R. § 1508.7. Thus, an agency must only consider the environmental impacts of future actions that are foreseeable. *City of Oxford, Ga.*, 428 F.3d at 1353. Restricting the analysis to foreseeable future actions "ensures that the details of these actions are sufficiently concrete for the agency to gather information useful to itself and the public." *Id.* at 1353-54. "With no concrete plan to consider . . . investigators and researchers would be forced to analyze the environmental impact of a project, the parameters and specifics of which would be a mere guess." *Id.* at 1356.

Plaintiff baldly asserts that the Suncoast II and Coastal Connector are related to each other and part of the larger plan for an I-75 Relief Corridor. Despite Plaintiff's assertions that every alternative corridor for the Coastal Connector connects to the Suncoast II, Martin Horwitz, an Environmental Administrator for the FDOT, averred that no alignment has been selected and that while several alignments are being analyzed, none of the proposed alignments end at SR 44, but rather, end roughly three miles away, north of CR 486. (Martin Horwitz Affidavit at ¶24).

Moreover, "just because the project at issue connects existing highways does not mean that it must be considered as part of a larger highway project; all roads must begin and end somewhere."

---

argument. The principal documents, e.g., the Environmental Assessment, HCP, and Biological Opinion, are replete with data and an analysis of the impact on the snake and tortoise and how that impact was evaluated, as well as the basis for the mitigation planned. And there is no evidence presented that would amount to a public outcry about the Suncoast II or the take/

*Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1247 (11th Cir. 1996). In this Circuit, a road is considered to be stand-alone if it: (1) connects logical termini and is of sufficient length to address environmental matters on a broad scope; (2) has independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and (3) does not restrict consideration of alternatives for other reasonably foreseeable transportation improvements. *Id.* Here, Suncoast II will connect an existing toll road, the original Suncoast Parkway, with State Road 44, that connects to I-75; it will provide a connection between Citrus County and the Tampa Bay area; it will reduce traffic congestion; and it will result in 597 fewer vehicle hours traveled per day. (Doc. 39-3, Affidavit of Josiah P. Banet at ¶10). Moreover, FDOT offered unrefuted evidence that Suncoast II is itself "economically feasible" as a stand-alone project. (Doc. 35-2, Affidavit of Bren Dietrich at ¶9).

Finally, contrary to Plaintiff's unsupported claims that the Coastal Connector is reasonably foreseeable, Martin Horwitz averred that the Coastal Connector Alternative Corridor Evaluation Study is in the early planning phase; no alignment has been selected; FDOT has no current plans to pursue the Coastal Connector; and there is no guarantee that this project will be designed or built or that it will connect with Suncoast II. (Martin Horwitz Affidavit at ¶24). On June 29, 2018, the FDOT advised that it has postponed the recommendations from the Coastal Connector planning study. (Doc. 38-7 at 27-28).

Accordingly, Plaintiff has failed to demonstrate a substantial likelihood of success in showing that construction of the Coastal Connector is reasonably foreseeable such that it should have been included in the FWS's analysis.

### 2. Southwest Water Management District Permit

At the hearing, Plaintiff argued for the first time that the Southwest Water Management District had issued a drainage permit to FDOT for the Suncoast II for up to 8 lanes and that FSW was required to consider the impact of these additional lanes. Plaintiff, however, failed to meet its burden to show a substantial likelihood of success on this claim.

At the hearing, Mr. Horwitz testified that FDOT applied to the Southwest Water Management District for a four-lane road and while the permit authorizes eight lanes of *drainage*, it does not authorize construction of eight lanes. Thus, if FDOT wanted to build eight lanes it would have to file a permit modification. Plaintiff offered no evidence refuting Mr. Horwitz's testimony or suggesting that it was reasonably foreseeable that the Suncoast II would be expanded to an eight-lane roadway.

### IV. CONCLUSION

Although Friends of Etna disagree with the FWS regarding its FONSI decision and issuance of the permit, Plaintiff has failed to point to anything that would make the FWS's decisions arbitrary and capricious or contrary to the requirements of NEPA and its attendant regulations. Accordingly, Plaintiff has failed to show that it is likely to succeed on the merits of its claims, and thus, its claim for preliminary injunction must fail.

ENTERED in Ocala, Florida on July 9, 2018.

_____
PHILIP R. LAMMENS
United States Magistrate Judge

c: District Judge
Counsel of Record